IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-145

 No. 363A20

 Filed 5 November 2021

 IN THE MATTER OF: T.T.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 13

 March 2020 by Judge Joy A. Jones in District Court, Harnett County. This matter

 was calendared in the Supreme Court on 30 September 2021 but determined on the

 record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina

 Rules of Appellate Procedure.

 Duncan B. McCormick, Staff Attorney, for petitioner-appellee Harnett County
 Department of Social Services.

 Mobley Law Office, P.A., by Marie H. Mobley, for appellee Guardian ad Litem.

 Parent Defender Wendy C. Sotolongo and Assistant Parent Defender J. Lee
 Gilliam for respondent-appellant mother.

 HUDSON, Justice.

¶1 Respondent appeals from the trial court’s order terminating her parental

 rights to her minor daughter, T.T. (Tiffany).1 After careful review, we affirm.

 1 Pseudonyms are used to protect the identities of the juveniles referred to in this

 opinion and for ease of reading. The order also terminated the parental rights of Tiffany’s
 legal father, Steven, and putative biological father, LaDarion, neither of whom are parties to
 this appeal.
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 I. Background

¶2 On 22 May 2014, Harnett County Department of Social Services (DSS) filed a

 juvenile petition alleging that ten-year-old Tiffany was neglected and obtained

 nonsecure custody of her.2 Tiffany was placed in a foster care placement.

¶3 The juvenile petition noted the family’s extensive history with social services

 in Prince George’s County, Maryland, and in Rockingham County, North Carolina,

 prior to DSS becoming involved. The petition alleged that, while the family lived in

 Maryland, the children were removed from respondent and Steven’s care in 2008 and

 placed in foster care due to domestic violence and Steven’s issues with mental health,

 anger, and substance abuse. After the children were returned to respondent’s care,

 social services in Maryland received a report in 2009 that Riley had been sexually

 abused by a family friend. Respondent did not comply with the investigation. The

 petition also noted other investigations of sexual and physical abuse of the children

 by family friends in the home, which found that respondent had a history of allowing

 people in her home who placed the children at risk. The petition further alleged that

 after the family relocated to Rockingham County, reports were made in 2009 and

 2010 claiming neglect, lack of care, inappropriate supervision and discipline,

 2 DSS also filed juvenile petitions concerning Tiffany’s minor siblings—sixteen-year-

 old J.H. (John), fifteen-year-old A.H. (Aiden), eleven-year-old R.T. (Riley), six-year-old S.T.
 (Scott), and five-year-old N.T. (Nina)—and obtained nonsecure custody of the siblings.
 Although referred to in this opinion, Tiffany’s siblings were not subjects of the termination
 proceeding and are not subjects of this appeal.
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 domestic violence, and an injurious environment. The reports in Rockingham County

 resulted in a determination in June 2010 that the family was in need of services.

 However, the family had fled the area and could not be contacted or located.

¶4 The petition also alleged that DSS received reports in Harnett County

 regarding the family on 5 December 2013 and 10 and 21 January 2014. The reports

 included concerns of neglect, improper supervision and care, inappropriate discipline,

 domestic violence, substance abuse, and an injurious environment. DSS’s assessment

 of the reports resulted in a case decision that the family was in need of services, and

 the case was transferred to In-Home Services on 7 February 2014. During a home

 visit with the family made in order to establish a Family Services Agreement (FSA),

 social workers had to separate respondent and Steven because they were yelling and

 screaming at each other in the presence of the children. The petition noted that

 respondent blamed the social workers for the incident. The petition indicated that

 respondent entered into a services agreement but alleged she only “minimally

 complied with the objectives and activities” provided therein.

¶5 The petition alleged the children’s safety and welfare continued to be a concern

 despite the services offered, and DSS received reports on 16 and 20 May 2014 about

 another domestic violence incident between respondent and Steven and about an

 incident where Nina was almost struck by a utility vehicle while she and Scott were

 outside near the road unsupervised. Lastly, the petition noted concerns with the
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 children’s school attendance, which was so poor that respondent was charged and

 incarcerated for Aiden’s truancy; the children being out of medication for behavioral

 problems; respondent’s withdrawal of the children from mental health services; and

 the parents’ failure to take John to the dentist for decayed teeth.

¶6 On 10 June 2014, respondent agreed to a visitation plan and an Out-of-Home

 Family Services Agreement (OHFSA). The visitation plan allowed respondent one

 hour of weekly supervised visitation with the children. The OHFSA required

 respondent to complete a psychiatric evaluation and follow recommendations,

 including consistent individual counseling; participate in domestic violence

 counseling through the SAFE program; complete a psychological evaluation with

 David Rademacher; enroll in and complete twenty-six weeks of the PRIDE parenting

 program, which was to include thirteen weeks of anger management classes; and

 attend regular visits with the children.

¶7 On 25 July 2014, the juvenile petition was heard jointly with petitions for

 Tiffany’s siblings, and the trial court entered a combined adjudication and disposition

 order for all the children. The trial court adjudicated Tiffany and her siblings

 neglected juveniles based on findings of fact echoing the allegations in the juvenile

 petition, including that respondent and Steven did not provide appropriate care or

 supervision to the children and exposed the children to domestic violence and that

 the children lived in an environment injurious to their welfare. The trial court
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 awarded DSS custody of the children; continued respondent’s visitation in accordance

 with an amended visitation plan; continued DSS’s reunification efforts; endorsed

 respondent’s OHFSA; and ordered respondent to demonstrate her compliance with

 all aspects of her OHFSA, to sign any consents or releases for information requested

 by DSS or the guardian ad litem (GAL), and to refrain from discussing the case with

 the children or encouraging the children to run away from foster care, which the trial

 court found she had done during visits. The trial court found that Steven had moved

 to Washington, D.C. after the children’s removal from the home and had not entered

 a services agreement.

¶8 The case came on for a permanency planning review hearing on 17 October

 2014, and the trial court entered its order on the same day. The trial court’s findings

 reflect respondent’s initial engagement in her OHFSA but subsequent failure to

 follow through with services. The trial court found respondent had completed a

 psychiatric evaluation with Daymark and a psychological evaluation with David

 Rademacher. The psychological evaluation resulted in diagnoses of adjustment

 disorder not otherwise specified, personality disorder not otherwise specified, and

 cannabis abuse, as well as recommendations for parenting classes, substance abuse

 counseling, psychotherapy, and domestic violence counseling. Dissatisfied with the

 results of the psychological evaluation, respondent refused to sign a release allowing

 the evaluation to be forwarded to Daymark for services. The court found respondent
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 did not want to participate in psychotherapy or any similar service. The court also

 found that respondent had completed intake and started domestic violence counseling

 sessions through the SAFE program and that she had completed intake and started

 parenting and anger management classes in the PRIDE program. However,

 respondent’s attendance had been inconsistent, and she had to restart classes due to

 absences. Respondent also tested positive for marijuana and brought a “shank” to the

 PRIDE program classes in August 2014. Because of the positive drug screen, it was

 recommended in September 2014 that respondent also complete thirteen weeks of

 Recovery Strategies, a substance abuse treatment program provided by the PRIDE

 parenting program. Lastly, the court found respondent regularly attended visits with

 the children but noted concerns with the visits, including: respondent did not use

 skills from parenting classes to correct the children’s out-of-control behavior; the

 visits were often loud and chaotic; respondent encouraged the children to disregard

 instructions from the social worker; and the GAL overheard inappropriate

 conversations between respondent and the children and observed respondent become

 aggressive, angry, upset, and confrontational.

¶9 In the 17 October 2014 permanency planning order, the trial court continued

 DSS’s custody of the children, set the permanent plan for the children as reunification

 with respondent, and continued respondent’s visitation with directives that she

 refrain from discussing certain topics with the children. The court ordered respondent
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 to comply with all aspects of her OHFSA, including the signing of requested releases

 of information, completion of anger management and parenting classes through the

 PRIDE program, and participation in psychotherapy or another form of therapeutic

 counseling. The court additionally ordered respondent to refrain from illegal drug

 use, begin thirteen weeks of the Recovery Strategies substance abuse program upon

 her completion of thirteen weeks of anger management through the PRIDE program,

 and cooperate with home visits by DSS and the GAL.

¶ 10 The next permanency planning hearing was conducted over the course of 22

 May and 12 June 2015. In an order entered on 30 July 2015, the trial court found

 that Steven had returned from Washington, D.C., resumed his relationship with

 respondent, and continued to live in the same home as respondent. The court found

 that respondent reported she returned to Daymark for group therapy in March 2015

 and that she signed a release for Daymark to provide DSS with her records in April

 2015. However, respondent revoked her release before Daymark could provide

 records to DSS. The court’s findings also show that respondent’s participation in

 domestic violence counseling through the SAFE program and participation in

 parenting, anger management, and substance abuse classes through the PRIDE

 program remained inconsistent, and respondent would have to restart all classes in

 the PRIDE program due to absences. The court’s findings noted that respondent

 completed twelve hours of anger management classes through a program in
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 Fayetteville, but the court also found that there continued to be arguments and fights

 between respondent and Steven, and between respondent and her adult daughter.

 Moreover, the court found respondent had been late to almost every visit; some visits

 were canceled; visits remained loud and chaotic; respondent did not correct the

 children and encouraged misbehavior; respondent often argued with the staff

 supervising visits, one time refusing to leave until being escorted away by a sheriff’s

 deputy; and respondent continued to discuss the case with the children. Lastly, the

 court found it concerning that respondent minimized her own responsibility for the

 circumstances; respondent was always on call for her job as a taxi driver and

 indicated she would rely on her adult daughter to care for the children; and

 respondent reported a plan to move to Fayetteville with some of the children while

 leaving other children to live with her adult daughter or Steven. Based on its findings,

 the trial court ceased reunification efforts with respondent, suspended respondent’s

 visitation with the children, and changed the permanent plan to guardianship.

¶ 11 The case continued to come on for regular permanency planning review

 hearings until the termination hearing. There were few updates from the hearings

 related to respondent and Tiffany’s case,3 and the trial court consistently found

 3 Regarding Tiffany’s siblings: John and Aiden reached the age of majority during the

 case; Scott and Nina were placed in legal guardianship with a paternal great aunt, and
 further review hearings in their cases were waived; and Riley remained in DSS custody, and
 her primary permanent plan changed to APPLA (Another Planned Permanent Living
 Arrangement) upon her reaching the age of sixteen.
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 respondent had not made significant progress and reunification efforts should remain

 ceased. Following a hearing on 11 March 2016, the court added custody with a

 relative or other suitable person as a secondary permanent plan while continuing

 guardianship as Tiffany’s primary permanent plan. Following a hearing on 1 June

 2018, the court found that Tiffany wanted to be adopted by her foster parents, with

 whom she had been placed since entering DSS custody on 22 May 2014 and that her

 foster parents were willing to adopt her. By order entered 6 July 2018, the trial court

 changed the primary permanent plan for Tiffany to adoption and the secondary

 permanent plan to guardianship.

¶ 12 On 29 November 2018, DSS filed a termination petition alleging grounds

 existed to terminate respondent’s parental rights to Tiffany pursuant to N.C.G.S.

 § 7B-1111(a)(1)–(3) for neglect, willful failure to make reasonable progress, and

 willful failure to pay a reasonable portion of Tiffany’s cost of care. After numerous

 continuances and after respondent filed an answer to the petition opposing

 termination on 28 August 2019, the termination petition was heard on 27 September

 2019. On 13 March 2020, the trial court entered an order terminating respondent’s

 parental rights. The trial court concluded that all three of the alleged grounds existed

 After it was reported that LaDarion may be Tiffany’s biological father, the trial court
 made him a party to Tiffany’s case as a putative father on 1 November 2016 and allowed
 visitation between Tiffany and LaDarion. However, reunification efforts with LaDarion were
 ceased on 30 June 2017 due to his failure to exercise visitation rights or establish paternity.
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 to terminate respondent’s parental rights to Tiffany and that termination was in

 Tiffany’s best interests. Respondent appealed.

 II. Analysis

¶ 13 On appeal, respondent challenges the trial court’s adjudication of the existence

 of grounds to terminate her parental rights.

 A. Standard of Review

¶ 14 This Court has explained the standard of review for termination of parental

 rights appeals as follows:

 Proceedings to terminate parental rights consist of an
 adjudicatory stage and a dispositional stage. At the
 adjudicatory stage, the petitioner bears the burden of
 proving by clear, cogent, and convincing evidence that one
 or more grounds for termination exist under section 7B-
 1111(a) of the North Carolina General Statutes. We review
 a trial court’s adjudication under N.C.G.S. § 7B-1109 to
 determine whether the findings are supported by clear,
 cogent and convincing evidence and the findings support
 the conclusions of law. The trial court’s conclusions of law
 are reviewable de novo on appeal.

 In re K.H., 375 N.C. 610, 612 (2020) (cleaned up).

 B. Grounds for Termination

¶ 15 The trial court terminated respondent’s parental rights to Tiffany on grounds

 of neglect, willful failure to make reasonable progress, and willful failure to pay a

 reasonable portion of Tiffany’s cost of care. See N.C.G.S. § 7B-1111(a)(1)–(3) (2019).

 “It is well established that an adjudication of any single ground for termination under

 N.C.G.S. § 7B-1111(a) will suffice to support a trial court’s order terminating parental
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 rights.” In re L.M.M., 375 N.C. 346, 349 (2020).

¶ 16 The trial court may terminate parental rights pursuant to N.C.G.S. § 7B-

 1111(a)(2) upon finding “[t]he parent has willfully left the juvenile in foster care or

 placement outside the home for more than 12 months without showing to the

 satisfaction of the court that reasonable progress under the circumstances has been

 made in correcting those conditions which led to the removal of the juvenile.” N.C.G.S.

 § 7B-1111(a)(2). This Court has explained that

 [t]ermination under this ground requires the trial court to
 perform a two-step analysis where it must determine by
 clear, cogent, and convincing evidence whether (1) a child
 has been willfully left by the parent in foster care or
 placement outside the home for over twelve months, and
 (2) the parent has not made reasonable progress under the
 circumstances to correct the conditions which led to the
 removal of the child.

 In re Z.A.M., 374 N.C. 88, 95 (2020).

¶ 17 Relevant to the adjudication of grounds to terminate respondent’s parental

 rights under N.C.G.S. § 7B-1111(a)(2), the trial court made the following findings of

 fact based on clear, cogent and convincing evidence concerning Tiffany’s removal from

 the home and placement in DSS custody and respondent’s lack of progress to correct

 the conditions leading to Tiffany’s removal:

 1. On 22 May 2014, [DSS] filed a juvenile petition
 alleging [Tiffany] and siblings to be neglected. On the
 same day, a court entered nonsecure orders placing
 [Tiffany] and siblings in nonsecure custody of DSS
 with authority for care and placement. . . .
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

....

4. A court conducted a permanency planning review
 hearing on May 22 and June 12, 2015. . . . The court
 ceased reunification efforts with the mother,
 suspended the mother’s visitation, and changed the
 permanent plan to guardianship . . . .

....

13. DSS filed a petition to terminate parental rights of
 [respondent] . . . on November 29, 2018.

....

28. [Tiffany] has been in the custody of DSS since
 May 22, 2014.

....

30. [Tiffany] and her siblings lived with [respondent] and
 [Steven] prior to the filing of the underlying juvenile
 petitions on May 22, 2014.

31. DSS received child protective services reports as to
 the family in December 2013 and January 2014.

32. DSS found the family to be in need of services. DSS
 transferred the case to in-home services on February
 7, 2014.

33. During a social worker’s attempt at a home visit,
 [respondent] and [Steven] yelled and screamed at
 each other to the point [respondent] felt the need to
 remove [Tiffany] and the siblings from the
 situation. . . . [Respondent] blamed the social worker
 for the incident.

34. The social worker separated [respondent] and
 [Steven]. The social worker was able to formulate an
 agreement with [respondent].
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

35. [Respondent] . . . minimally complied with the
 objectives and activities on [her] case plan during the
 provision of in-home services.

36. [Respondent] withdrew [Tiffany] and the siblings from
 their mental health services.

37. [Respondent] delayed seeking other services.

38. [Respondent] was charged and incarcerated for a
 school attendance law violation with respect to an
 older sibling, [Aiden].

39. [Respondent] withdrew a younger sibling, [Scott],
 from kindergarten. [Scott] was a second[-]year
 kindergarten student at the time of his withdrawal.

40. On May 16, 2014, DSS received a report of neglect,
 domestic violence[,] and injurious environment due to
 an incident between the [respondent] and [Steven].
 The argument escalated. [Respondent] attempted to
 leave with an adult daughter. [Steven] jumped on top
 of the van. [Steven] banged and kicked the windshield
 of the van as [respondent] drove away. [Tiffany] was
 present at the time of the incident. [Tiffany] witnessed
 the incident.

41. On May 20, 2014, DSS received a report of neglect,
 improper supervision, and injurious environment.
 The reporter found younger siblings, [Nina] and
 [Scott], outside near the road unsupervised. The
 reporter knocked on the door. The reporter informed
 [respondent] and an adult daughter that the siblings
 were outside unsupervised.

42. [Nina] was in the road. A truck slammed on brakes to
 avoid hitting her.

43. [Respondent] and [Steven] exposed [Tiffany] to
 domestic violence at the time of and prior to the filing
 of the underlying juvenile petition.
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

44. [Tiffany] described violence between [respondent] and
 [Steven]. They struck each other. They threw things
 at each other. [Tiffany] saw bruises on [respondent],
 but she did not see any serious injuries.

45. [Tiffany] described seeing [respondent] and [Steven]
 verbally argue.

....

48. [Respondent] and [Steven] did not provide
 appropriate care or supervision to [Tiffany] at the
 time of and prior to the filing of the underlying
 juvenile petition.

49. [Tiffany] lived in an environment injurious to her
 welfare in the home of [respondent] and [Steven] at
 the time of and prior to the filing of the underlying
 juvenile petition.

....

52. [Respondent] and [Steven] argued with each other in
 the presence of others in April 2015.

53. [Respondent] in 2015 revoked a consent to allow DSS
 to review records at Daymark Recovery Services.

54. [Respondent] was required to participate in domestic
 violence counseling through SAFE. [Respondent] did
 not complete that program.

55. [Respondent] and an adult daughter fought in the
 home on April 15, 2015. [Steven] intervened on the
 side of the adult daughter. [Respondent] got upset and
 accused the adult daughter of sleeping with [Steven].

56. [Respondent] and [Steven] got into a scuffle several
 weeks after the April 15, 2015 incident when [Steven]
 purchased windows that were too big.

57. [Respondent] was required to enroll and complete
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 parenting classes at PRIDE.

 58. [Respondent] did not complete the PRIDE program.

 59. [Respondent] completed a 12-hour parenting class in
 Fayetteville, but this class was not the equivalent of
 PRIDE.

 60. [Respondent] was referred to the Recovery Strategies
 program at PRIDE following a positive drug screen.
 [Respondent] did not complete this program.

 61. [Respondent] did not make any significant progress on
 her case plan between 2015 and the date of this
 hearing.

 62. [Respondent] did not complete an anger management
 program.

 63. [Respondent] did not complete an intensive parenting
 education program.

 64. [Respondent] did not complete a substance abuse
 treatment program.

 65. [Respondent] did not participate in consistent,
 regular, therapeutic counseling.

¶ 18 Based on these findings of fact, the trial court found and concluded that

 respondent willfully left Tiffany in foster care or placement outside the home for more

 than twelve months prior to the filing of the termination petition without showing to

 the satisfaction of the court that reasonable progress under the circumstances had

 been made in correcting the conditions which led to Tiffany’s removal. The court thus

 concluded grounds existed to terminate respondent’s parental rights pursuant to

 N.C.G.S. § 7B-1111(a)(2).
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

¶ 19 Respondent does not challenge any of the above findings of fact. “Findings of

 fact not challenged by respondent are deemed supported by competent evidence and

 are binding on appeal.” In re T.N.H., 372 N.C. 403, 407 (2019) (citing Koufman v.

 Koufman, 330 N.C. 93, 97 (1991)).

¶ 20 Respondent’s challenges to the trial court’s adjudication of grounds for

 termination under N.C.G.S. § 7B-1111(a)(2) focus on the second step of the analysis

 regarding reasonable progress. See In re Z.A.M., 374 N.C. at 95. Respondent argues

 the trial court’s findings do not support the court’s determination that she failed to

 make reasonable progress under the circumstances to correct the conditions that led

 to Tiffaney’s removal. We disagree.

¶ 21 This Court has explained,

 parental compliance with a judicially adopted case plan is
 relevant in determining whether grounds for termination
 exist pursuant to N.C.G.S. § 7B-1111(a)(2). A trial court
 should refrain from finding that a parent has failed to
 make reasonable progress in correcting the conditions that
 led to the children’s removal simply because of his or her
 failure to fully satisfy all elements of the case plan goals.
 However, a trial court has ample authority to determine
 that a parent’s extremely limited progress in correcting the
 conditions leading to removal adequately supports a
 determination that a parent’s parental rights in a
 particular child are subject to termination pursuant to
 N.C.G.S. § 7B-1111(a)(2).

 In re E.C., 375 N.C. 581, 585 (2020) (cleaned up).

¶ 22 Here, the evidence and unchallenged findings establish the conditions
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

resulting in Tiffany’s removal from the home were domestic violence, improper care

and supervision, and an injurious environment. It is undisputed that respondent

agreed to an OHFSA with DSS on 10 June 2014 with components to address domestic

violence and parenting. The OHFSA specifically required respondent to participate

in domestic violence counseling through the SAFE program and to complete twenty-

six weeks of the PRIDE parenting program, which was to include thirteen weeks of

anger management. The OHFSA also required respondent to complete psychiatric

and psychological evaluations and follow all recommendations, including individual

counseling. There is no contention that the OHFSA requirements were not directly

or indirectly related to addressing the conditions of removal. As set forth in the trial

court’s findings above, the trial court found that respondent did not complete the

required domestic violence counseling through the SAFE program and that she did

not complete the required parenting classes through the PRIDE program. The court

found respondent completed a different parenting program, but the program was not

the equivalent of the PRIDE program specified in the OHFSA. The court also found

respondent was referred to the Recovery Strategies substance abuse program at

PRIDE following a positive drug screen, but she did not complete the substance abuse

program. Lastly, in findings sixty-one through sixty-five, the trial court succinctly

found that respondent had not completed each of the programs required by her

OHFSA and had not made “any significant progress on her case plan between 2015
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 and the date of [the termination] hearing.”

¶ 23 Respondent does not contest the trial court’s findings that she did not complete

 the requirements of her case plan. She instead argues her lack of case plan progress

 is not dispositive, and there was no evidence that the conditions that led to Tiffany’s

 removal still existed. Respondent relies on the Court of Appeals’ decisions in In re

 Y.Y.E.T., 205 N.C. App. 120, 131, disc. review denied, 364 N.C. 434 (2010), and In re

 D.A.H.-C., 227 N.C. App. 489, 501 (2013), which note that a “case plan is not just a

 check list” and that “parents must demonstrate acknowledgement and understanding

 of why the juvenile entered DSS custody as well as changed behaviors.” We are not

 persuaded the trial court erred and believe respondent’s reliance on these Court of

 Appeals cases is misplaced.

¶ 24 In both In re Y.Y.E.T. and In re D.A.H.-C., the court reviewed the termination

 of parental rights decision on grounds of neglect under N.C.G.S. § 7B-1111(a)(1). In

 re Y.Y.E.T., 205 N.C. App. at 127–30; In re D.A.H.-C., 227 N.C. App. at 499–501.

 Nevertheless, the court addressed arguments in each case that termination was

 improper because the respondents had made progress in their case plans.4 In re

 Y.Y.E.T., 205 N.C. App. at 130–31; In re D.A.H.-C., 227 N.C. App. at 500. Although

 4 In In re Y.Y.E.T., the respondent raised his compliance with his case plan as an

 argument challenging disposition. 205 N.C. App. at 130–31. The trial court addressed the
 argument but noted “compliance with the case plan is not one of the factors the trial court is
 to consider in making the best interest determination.” Id. at 131.
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 noting the respondents’ progress, the court upheld termination in each case. In re

 Y.Y.E.T., 205 N.C. App. at 131; In re D.A.H.-C., 227 N.C. App. at 501. It was in this

 context—where the respondents had shown progress in their case plans, but the trial

 court nevertheless found a repetition of neglect was likely because the respondents

 had not demonstrated changed behavior—that the court noted a “case plan is not just

 a check list[.]” In re Y.Y.E.T., 205 N.C. App. at 131 (explaining that despite the

 respondent’s case plan compliance, he refused to acknowledge how the juvenile was

 injured and who perpetrated the injury); In re D.A.H.-C., 227 N.C. App. at 500–01

 (explaining that despite the respondent’s progress, she failed to recognize the

 conditions which led to the prior adjudications and continued to associate with

 individuals who mistreat her children). Neither case stands for the proposition that

 a lack of case plan compliance should be overlooked in determining whether there

 has been reasonable progress under N.C.G.S. § 7B-1111(a)(2).

¶ 25 Unlike In re Y.Y.E.T. and In re D.A.H.-C., this is not a case where there was

 substantial case plan compliance.5 This is not even a case where respondent

 completed some aspects of her case plan and where we are left to judge whether the

 5 Respondent also cites to In re J.S.L., 177 N.C. App. 151 (2006), asserting that the

 Court of Appeals reversed a termination of parental rights order based on N.C.G.S. § 7B-
 1111(a)(2) because the trial court found only one specific instance of domestic violence after
 the removal of the children from the home. However, the court’s reversal in In re J.S.L. was
 not based solely on the lack of findings of specific instances of domestic violence in the home.
 As in In re Y.Y.E.T. and In re D.A.H.-C., and unlike the instant case, the respondent in In re
 J.S.L. had substantially complied with the requirements of his case plan. In re J.S.L., 177
 N.C. App. at 163–64, 628 App. at 394.
 IN RE T.T.

 2021-NCSC-145

 Opinion of the Court

 trial court’s determination that respondent failed to make reasonable progress is

 sound. It is clear in this case that respondent did not complete any of the programs

 required in her OHFSA to correct the conditions resulting in Tiffany’s removal. We

 are satisfied the findings in this case, that respondent did not complete the programs

 required by her OHFSA to address the domestic violence and parenting issues in the

 home, are supported by the evidence of record and support the trial court’s

 determination that respondent had not made reasonable progress under the

 circumstances to correct the conditions leading to Tiffany’s removal.

 III. Conclusion

¶ 26 We conclude that the trial court did not err in finding grounds existed to

 terminate respondent’s parental rights to Tiffany under N.C.G.S. § 7B-1111(a)(2).

 Because “an adjudication of any single ground for termination under N.C.G.S. § 7B-

 1111(a) will suffice to support a trial court’s order terminating parental rights[,]” In re

 L.M.M., 375 N.C. at 349, we need not address respondent’s arguments regarding

 N.C.G.S. § 7B-1111(a)(1) and (3), the other grounds adjudicated by the trial court.

 Furthermore, respondent does not contest the trial court’s conclusion that

 termination of her parental rights was in Tiffany’s best interests. See N.C.G.S. § 7B-

 1110(a) (2019). Accordingly, we affirm the trial court’s termination order.

 AFFIRMED.