IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-21

No. 69A20

Filed 19 March 2021

IN THE MATTER OF: A.M.L., G.J.L., B.J.B., J.E.B., T.R.B., Jr.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 26 November 2019 by Judge Jeanie R. Houston in District Court, Wilkes County. This matter was calendared for argument in the Supreme Court on 11 February 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Erika Leigh Hamby for petitioner-appellee Wilkes County Department of Social Services.*

*Poyner Spruill LLP, by John Michael Durnovich and Christopher S. Dwight, for appellee Guardian ad Litem.*

*Sydney Batch for respondent-appellant mother.*

BARRINGER, Justice.

¶ 1 Respondent-mother appeals from the trial court's 26 November 2019 orders terminating her parental rights in her minor children A.M.L. (Allie),[1] G.J.L. (Gregory), T.R.B., Jr. (Teddy), J.E.B. (Johnson), and B.J.B. (Braxton).[2] Upon careful

---

[1] Pseudonyms are used throughout this opinion to protect the identities of the juveniles.

[2] While the parental rights of the children's fathers were also terminated, neither father appealed the trial court's termination orders nor are they parties to this appeal. The trial court terminated the parental rights of Teddy, Johnson, and Braxton's father in the

consideration, we affirm the trial court's orders terminating respondent-mother's parental rights.

## I. Factual and Procedural Background

The Wilkes County Department of Social Services (DSS) first became involved with respondent-mother almost a decade and a half before the ultimate termination of her parental rights. In July of 2005, DSS conducted a family assessment based on allegations of neglect. At that time, respondent-mother's eldest child, Allie, was barely one year old, while her little brother, Gregory, was only a few months old. Since that first assessment, respondent-mother has incurred more than a dozen subsequent DSS assessments, subjecting Allie and Gregory, as well as their younger brothers Teddy, Johnson, and Braxton, to multiple placements in foster care, three placements in case management, and numerous case decisions for services needed or services recommended.

On 25 January 2018, DSS received a report alleging drug use in respondent-mother's home while her five children—thirteen-year-old Allie, twelve-year-old Gregory, ten-year-old Teddy, three-year-old Johnson, and three-year-old Braxton— were locked in a room. DSS's investigation confirmed the allegations. Allie and Gregory reported that their parents invited strange men into the home, permitted

same 26 November 2019 orders that terminated respondent-mother's parental rights. As for Allie and Gregory's father, the trial court terminated his parental rights by a different order entered in a separate termination hearing.

drug use in the home, used drugs themselves, and locked the children in a room for hours at a time, leaving Allie to care for her younger siblings. Further, respondent-mother encouraged Allie and Gregory to use marijuana, and Gregory, influenced by the encouragement, used marijuana.

¶ 4 In response, DSS attempted to place the children in safety resource placements. However, both placements failed—the first caregiver was unable to care for the children and the second disregarded the safety plan and allowed the parents unsupervised time alone with the children. As a result, DSS obtained nonsecure custody of the children and filed juvenile petitions alleging that the children were neglected juveniles. After a hearing on 19 March 2018, the trial court entered a disposition order on 28 June 2018 adjudicating the children to be neglected juveniles, ordering custody of the children to remain with DSS, and granting supervised visitation to respondent-mother on the condition that she pass random drug screens.

¶ 5 DSS prepared a case plan that required respondent-mother to take parenting classes, complete a substance abuse assessment and follow any treatment recommendations, complete a mental health assessment and follow any treatment recommendations, participate in a recovery group, obtain and maintain appropriate housing and employment, complete random drug screens, attend a group designed to assist with special needs children, develop knowledge of Johnson's diagnosis and needs, attend all visitations, sign a voluntary support agreement, remain in contact

and attend meetings with DSS, refrain from criminal activity, and provide written statements as to why the children were placed in DSS custody.

¶ 6　　In the permanency planning and review orders entered after a 25 June 2018 hearing, the trial court found that respondent-mother had made no progress on her case plan. After signing the case plan, respondent-mother had failed two drug screens (testing positive for methamphetamine and OxyContin), been incarcerated twice in the prior three weeks, failed to comply with any of DSS's requests, maintained minimal contact with the social worker, and only visited once with all five children. In addition, since the children entered custody on 31 January 2018, respondent-mother had incurred twenty-six criminal charges. As a result, the trial court left custody of the children with DSS, set the primary plan for the children as adoption with a secondary plan of custody with an approved caregiver, and relieved DSS of further efforts towards reunification.

¶ 7　　In an order filed following the next permanency-planning hearing on 4 February 2019, the trial court found that respondent-mother had made "very little progress" on her case plan and still "need[ed] significant substance abuse and mental health treatment." Due to its assessment, the trial court made no changes to custody, visitation, or the children's permanent plans.

¶ 8　　On 4 March 2019, DSS filed petitions to terminate respondent-mother's parental rights due to her neglect and willful failure to make reasonable progress

under N.C.G.S. § 7B-1111(a)(1) and (2). In addition, DSS alleged that grounds existed to terminate respondent-mother's parental rights in Teddy, Johnson, and Braxton for dependency under N.C.G.S. § 7B-1111(a)(6). The trial court held the termination hearing on 13 June and 1 July 2019.

On 26 November 2019, the trial court entered orders terminating respondent-mother's parental rights. After making extensive findings of fact, the trial court concluded that grounds existed to terminate respondent-mother's parental rights in each child pursuant to N.C.G.S. § 7B-1111(a)(1), (2), and (6) and that it was in each child's best interests to terminate respondent-mother's parental rights. Respondent-mother appeals from these termination orders.

## II. Standard of Review

The Juvenile Code provides a two-step process for termination of parental rights consisting of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109 to -1110 (2019). During the adjudicatory stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence that one or more grounds for termination exists. N.C.G.S. § 7B-1109(e)–(f). If the petitioner meets this burden, the matter proceeds to the dispositional stage where the trial court must determine whether termination of parental rights is in the children's best interests. N.C.G.S. § 7B-1110(a).

This Court reviews the trial court's adjudication of grounds to terminate parental rights under N.C.G.S. § 7B-1111(a) "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re N.G.*, 374 N.C. 891, 895 (2020) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). If a finding of fact is supported by clear, cogent, and convincing evidence, it "is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. 372, 379 (2019). Meanwhile, findings of fact "not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407 (2019). Finally, this Court reviews de novo "whether a trial court's findings of fact support its conclusions of law." *In re J.S.*, 374 N.C. 811, 814 (2020).

### III. Analysis

Respondent-mother challenges all three grounds for termination adjudicated by the trial court. Since "an adjudication of any single ground for termination under N.C.G.S. § 7B-1111(a) will suffice to support a trial court's order terminating parental rights," this Court need only uphold one of the statutory grounds adjudicated by the trial court. *In re L.M.M.*, 375 N.C. 346, 349 (2020).

The second ground adjudicated for the termination of respondent-mother's parental rights was for willfully leaving her children in foster care or placement outside the home without making reasonable progress, per N.C.G.S. § 7B-1111(a)(2).

To terminate parental rights under this provision, the trial court must find that respondent-mother (1) "willfully left the juvenile[s] in foster care or placement outside the home for more than 12 months," and (2) respondent-mother did not show "reasonable progress under the circumstances . . . in correcting those conditions which led to the removal of the juvenile[s]." N.C.G.S. § 7B-1111(a)(2) (2019).

¶ 14   In adjudicating grounds for the termination of respondent-mother's parental rights, the trial court made the following findings of fact:[3]

> 16. The minor child[ren have] remained in the care and custody of the Wilkes County Department of Social Services continuously since January 31, 2018 and therefore, [have] been in the care and custody of [DSS] for approximately sixteen (16) months at the time of this hearing.
>
> . . . .
>
> 18. Investigator Norwood spoke to [Allie] who indicated that there was active drug use in the home, some drug use in front of the children, Respondent Mother encouraged the older children to use marijuana, and [Allie] and her siblings were locked in a room while she was made to provide care for them.
>
> . . . .
>
> 20. At the time of the report the family was living in a house on Boone Trail. [Allie] got an award from school and was excited to show her mother and step-father. She went into the bathroom and saw Mother with a needle in her arm and step-father with a cloth around

---

[3] The quoted language comes from the order terminating respondent-mother's parental rights in Allie. While the trial court entered separate orders for each child, the orders are nearly identical as to the findings and conclusions related to respondent-mother.

his arm.

21. [Allie] confirmed that Respondent Mother and her step-father were aware that the children had been offered marijuana by a cousin and they allowed at least one of the children to use marijuana.

. . . .

26. After the minor child[ren] w[ere] placed into the care and custody of [DSS], a Family Services Case Plan was developed on February 27, 2018 for Respondent Mother to address the conditions that led to the minor child[ren]'s removal from the home specifically: substance abuse, parenting skills, and mental health.

27. Respondent Mother signed her Family Services Case Plans with [DSS] on May 1, 2018, after the minor child[ren] had been in care for over four months.

28. Prior to May 1, 2018 Respondent Mother was not cooperating with the agency, she was not maintaining contact with the Social Worker, and was not utilizing visitation with the minor child[ren].

. . . .

33. Subsequent to the minor child[ren] coming into the care of [DSS], Respondent Mother obtained 26 new criminal charges in four surrounding counties. These charges included breaking and entering, simple possession of controlled substances, and larceny. She spent some time in jail after initially being charged, but she did not have any lengthy period of incarceration.

. . . .

35. [DSS] sent referrals for substance abuse and mental health assessments to Daymark Recovery in May 2018. Respondent Mother did not complete assessments with Daymark until approximately March 2019 while in

Case Management with her new child. This assessment appeared to be only a substance abuse assessment, and did not appear to include a mental health assessment.

36. Respondent Mother tested positive for buprenorphine at the time of her assessment with Daymark in March 2019. When questioned about being positive for buprenorphine, she told the assessors that she was participating in treatment with Rowan Psychiatric. Due to her reported compliance with Rowan Psychiatric, she was not given any recommendations by Daymark other than to continue in treatment.

37. [DSS] was unaware of the mother's participation with Rowan Psychiatric until receiving the assessment from Daymark Recovery. [DSS] cannot verify that the mother completed an assessment at Rowan Psychiatric, or that she was receiving the comprehensive treatment including medication and counseling.

38. The Social Worker requested Respondent Mother's records from Rowan Psychiatric. The Social Worker received records for Respondent Mother, but those records primarily consisted of drug screen results. Most screens were negative, but the records did indicate that the mother tested positive for oxymorphone in November 2018. Respondent Mother began attending Rowan Psychiatric in September 2018.

. . . .

46. Respondent Mother was requested to attend Recovery Seekers or a similar group for individuals in recovery. She has not participated in such a group.

47. Respondent Mother was to participate in random drug screens to demonstrate compliance with substance abuse treatment, and appropriate use of medication. Mother was called for approximately twenty-three

random drug screens.

    a.   She *failed to show* for screens eight times . . . .

    b.   Respondent Mother appeared and *passed* drug screens nine times . . . .

    c.   Respondent Mother appeared and *failed* drug screens five times on the following dates: February 6, 2018 failed for methamphetamine, July 16, 2018 failed for amphetamine, October 1, 2018 failed for oxymorphone, November 6, 2018 failed for oxymorphone, and May 16, 2019 failed for amphetamine and methamphetamine.

48. Respondent Mother asserted that she believed she failed the May 16, 2019 drug screen due to taking Zyrtec and Sudafed for allergies and congestion. The [c]ourt did not find this assertion compelling.

. . . .

55. Respondent Mother indicates that she attends Rowan Psychiatric for Subutex treatment, and states that she has appointments once a month to receive her medications, attend counseling, and see her doctor. She indicates that she is drug tested when she visits the doctor, and that she is receiving treatment for bi-polar as well.

56. Respondent Mother acknowledged that she did not inform the Social Worker about her participating in treatment at Rowan Psychiatric or the prescription medication(s) she received as part of that treatment.

. . . .

60. Respondent Mother claims to be drug free for 6 to 7 months, but failed drug screens in November 2018 and May 2019.

61. Respondent Mother tends to overstate her periods of

sobriety. . . .

. . . .

64. Respondent Mother attributed [her] late start working on the Case Plan to not having a hard copy of the Case Plan to reference. The [c]ourt did not find this persuasive as Respondent Mother had participated in multiple cases of Case Management with [DSS] in the past and had always been able to complete those items timely.

65. Respondent Mother and her husband in fact completed their Voluntary Services Plan for their newest child within 60 days.

66. The minor child[ren] . . . have been in the care of [DSS] on two other occasions due to similar allegations regarding substance abuse. On both occasions Respondent Mother complied with her Family Services Case Plan and the children were returned to her care only to reenter care again due to the same or similar concerns of substance abuse.

67. Respondent Mother admitted that even without a hard copy Case Plan to reference, due to her past involvement with [DSS] she was aware that she would need to take parenting classes, and address her substance abuse concerns.

. . . .

69. Though Respondent Mother purports to have been working a substance abuse treatment plan through Rowan Psychiatric since September 2018, she has failed at least three drug screens since September 2018.

70. Respondent Mother reports that she is being treated for bipolar though her records received from Rowan Psychiatric do not reveal a mental health assessment

or any mental health treatment.

. . . .

72. Respondent Mother has not adequately addressed her substance abuse or mental health issues . . . .

After making these findings, the trial court concluded

[t]hat upon clear, cogent, and convincing evidence that the minor child[ren have] been willfully left in foster care for more than twelve (12) months without Respondent Mother making reasonable progress to correct the conditions that led to [their] removal, specifically substance abuse, parenting skills, and mental health. Considering that Respondent Mother has made very little progress on her Family Services Case Plan, and there is no evidence she has adequately addressed these issues outside of a Case Plan, and she ultimately did not maintain a stable bond between herself and the minor child[ren]. Therefore, the Petitioner has shown that grounds exist pursuant to N.C.G.S. § 7B-1111(a)(2) to terminate Respondent Mother's parental rights.

On appeal, respondent-mother concedes that she left her children in foster care for sixteen months, exceeding the twelve months required to terminate parental rights under N.C.G.S. § 7B-1111(a)(2). However, respondent-mother contests several of the trial court's findings of facts, as well as its conclusion to terminate her parental rights, arguing that she substantially complied with the case plan.

**A. Challenge to the Trial Court's Finding That There Was Time Available for Respondent-Mother to Complete the Case Plan**

Respondent-mother begins by challenging the trial court's findings concerning her lack of progress before signing the case plan on 1 May 2018. According to

respondent-mother, she was not provided a copy of her case plan when DSS first created it on 27 February 2018. However, the trial court considered this assertion in its findings of fact, noting that respondent-mother had successfully completed two previous case plans and thus "was aware that she would need to take parenting classes[ ] and address her substance abuse concerns." Moreover, respondent-mother testified that she knew from the beginning that, regardless of the case plan, she needed to address her substance abuse issues. Yet despite this knowledge, respondent-mother did not point to a single action taken prior to 1 May 2018 that addressed either her parenting or substance abuse issues.

¶ 18      Additionally, the trial court noted that respondent-mother's alleged "late start working on the Case Plan" was not persuasive because she had previously completed two other case plans in a timely manner. The record supports this determination. DSS created the case plan on 27 February 2018. Even if respondent-mother did not receive a copy of the case plan until 1 May 2018, she was without a physical copy for at most sixty-two days. In comparison, the termination hearing occurred a full year after 1 May 2018, on 13 June and 1 July 2019, giving respondent-mother ample time to comply with the case plan after she signed it. Accordingly, the trial court did not err by finding that respondent-mother had sufficient time—namely an entire year— to make reasonable progress on the case plan, regardless of the two months she may have been without a physical copy.

¶ 19 In a similar vein, respondent-mother challenges finding of fact 28—that she was not cooperating with DSS, not maintaining contact with the social worker, and not visiting her children prior to 1 May 2018. This finding of fact has no impact on our analysis. Accordingly, we decline to address respondent-mother's assignment of error regarding finding of fact 28. As previously noted, even ignoring the two months that elapsed between the case plan's creation and the day it was signed, respondent-mother still had more than a full year to make reasonable progress on the case plan. Regardless of her behavior during the two months when she allegedly was unable to contact the social worker or visit the children, her actions during the next year were sufficient to support the trial court's finding that she failed to make reasonable progress on her case plan.

**B. Challenge to the Trial Court's Finding That Respondent-Mother Did Not Make Progress on the Case Plan**

¶ 20 Respondent-mother's primary argument is that her actions in the year before the termination hearing contradict the trial court's findings that she made very little progress on her case plan. However, the trial court acknowledged these actions in its findings of fact; they simply were not enough to comprise reasonable progress. After careful review, we hold that the trial court's conclusion that grounds for termination of respondent-mother's parental rights existed under N.C.G.S. § 7B-1111(a)(2) was supported by the findings of fact, and so we affirm.

¶ 21        As this Court has recognized, "in order for a respondent's noncompliance with her case plan to support the termination of her parental rights, there must be a nexus between the components of the court-approved case plan with which the respondent failed to comply and the conditions which led to the child's removal from the parental home." *In re J.S.*, 374 N.C. at 815–16 (cleaned up) (quoting *In re B.O.A.*, 372 N.C. at 385). In this case, the nexus is respondent-mother's substance abuse, which directly led to the children's removal on 31 January 2018 and had previously led to her losing custody of the children on multiple other occasions. Accordingly, the case plan created by DSS was tailored to help respondent-mother overcome her substance abuse issues, as well as address her parenting skills and mental health struggles. While respondent-mother emphasizes the progress she made on the parenting skills portion of the case plan, the trial court's findings focused on the true gravamen of her case— her substance abuse—as well as her mental health struggles. Since "we review only those findings needed to sustain the trial court's adjudication," we address only her substance abuse and mental health issues. *See In re J.S.*, 374 N.C. at 814.

¶ 22        As previously noted, respondent-mother's substance abuse has resulted in DSS's recurring involvement with the family and the children's placement in DSS custody on multiple prior occasions. Respondent-mother testified that she had attempted recovery numerous times and agreed with Allie's testimony that she has been in a cycle of recovery and relapse. In its findings, the trial court noted that

respondent-mother had been "in recovery on at least three prior occasions" and had "admit[ed] and acknowledged a history of substance abuse in her written statements as to why the children were brought into care, as well as during conversation with the Social Worker."

¶ 23        Although respondent-mother recognized that her substance abuse resulted in losing custody of her children, she failed to make adequate progress to address it during the sixteen months following the children's removal. Respondent-mother's case plan required her to complete a substance abuse assessment, submit to drug screens, and participate in a group recovery program. In May 2018, DSS referred respondent-mother to Daymark Recovery for a substance abuse assessment as part of the case plan concerning Allie, Gregory, Teddy, Johnson, and Braxton, but respondent-mother never went. Instead, it was not until she was completing her case plan regarding a different child, her infant born on 18 January 2019, that respondent-mother went to Daymark Recovery for an assessment in March 2019. In addition, although respondent-mother was required to attend a recovery group, she never participated in one.

¶ 24        Even more concerning, respondent-mother repeatedly failed drug screens throughout the pendency of her case, including one less than a month before the 13 June 2019 termination hearing. Of the more than twenty random drug screens DSS requested, respondent-mother failed five screens, did not show up for an

additional eight screens, and passed only nine. Moreover, the trial court's findings reveal that out of the five drugs screens respondent-mother failed, three of them occurred after respondent-mother purported to have begun participating in substance abuse treatment through Rowan Psychiatric in September 2018.[4] The most recent failed screen—at which respondent-mother tested positive for amphetamine and methamphetamine—occurred on 16 May 2019, less than one month before the termination hearing. While respondent-mother asserted that this failed screen was due to taking Zyrtec and Sudafed for allergies and congestion, the trial court gave little weight to the explanation, specifically stating that it "did not find this assertion compelling."

¶ 25    Respondent-mother argues that she made such substantial progress in addressing her substance abuse that the trial court erred by finding sufficient grounds to terminate her parental rights. In support of this contention, respondent-mother relies on her own testimony that she completed a substance abuse assessment at Rowan Psychiatric and was participating in treatment. The trial court considered this evidence in making its decision. However, the trial court found respondent-mother's assertions were undermined by her failure to report any of this treatment

---

[4] The findings further show that two of respondent-mother's missed drug screens occurred after she purported to have been seeking treatment at Rowan Psychiatric.

to DSS—and, more importantly, the fact that DSS's record request to Rowan Psychiatric revealed primarily drug screen results.

¶ 26        According to the social worker's testimony, Rowan Psychiatric reported that respondent-mother was not participating in a full substance abuse program and had not completed a substance abuse assessment. Instead, respondent-mother was only participating in a methadone treatment program. Based on the social worker's testimony and the records Rowan Psychiatric provided DSS, which consisted primarily of drug screen results, the trial court found that DSS could not "verify that [respondent-mother] completed an assessment at Rowan Psychiatric, or that she was receiving comprehensive treatment."

¶ 27        The second focus of the trial court's findings was respondent-mother's mental health issues. On appeal, respondent-mother does not challenge any of the trial court's findings concerning her failure to make reasonable progress toward improving her mental health. Therefore, these findings "are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. at 407.

¶ 28        While N.C.G.S. § 7B-1111(a)(2) does not require parents to "fully satisfy all elements of the case plan goals," they must at least make more than " 'extremely limited progress' in correcting the conditions leading to removal." *In re B.O.A.*, 372 N.C. at 385 (quoting *In re J.S.L.*, 177 N.C. App. 151, 160, 163 (2006)). The findings above show that despite respondent-mother recognizing that her substance abuse

issues were the primary reason she kept losing custody of her children, she still failed to show reasonable progress under her case plan, particularly in correcting the conditions which led to the removal of her children. Respondent-mother frequently skipped drug screens; failed a number of the drug screens, including one less than a month before the termination hearing; did not participate in any support group; and, at best, participated in only limited treatment. These facts, combined with respondent-mother's noncompletion of any of the mental health aspects of the case plan, support the trial court's conclusion that she failed to make reasonable progress to remedy the conditions that led to the children's removal, regardless of respondent-mother's steps toward improving her parenting skills.

## C. Challenge to the Trial Court's Finding of Willfulness

Respondent-mother also challenges the trial court's conclusion that her failure to make reasonable progress was willful. This Court has already established that "[t]he determination that respondent acted 'willfully' is a finding of fact rather than a conclusion of law." *In re J.S.*, 374 N.C. at 818. In addition, a "finding that a parent acted 'willfully' for [the] purposes of N.C.G.S. § 7B-1111(a)(2) does not require a showing of fault by the parent." *Id.* at 815 (cleaned up) (quoting *In re Oghenekevebe*, 123 N.C. App. 434, 439 (1996)). It simply requires respondent-mother's "prolonged inability to improve her situation, despite some efforts in that direction." *Id.* (quoting *In re J.W.*, 173 N.C. App. 450, 465 (2005)).

¶ 30    The evidence reviewed above already establishes respondent-mother's prolonged failure to improve her situation. Further, respondent-mother's willfulness was confirmed by her ability to complete the case plan for her infant child. While respondent-mother argues that DSS's determination not to seek custody of that child contradicts the trial court's decision to terminate her parental rights in the rest of the children, it actually highlights her willfulness. After all, respondent-mother completed the case plan concerning her infant child, leading DSS to not seek custody of the newborn. In contrast, as discussed above, respondent-mother did not make reasonable progress on the case plan concerning the rest of her children. Moreover, the trial court noted that on two previous occasions respondent-mother had timely completed her assigned case plans. Given this evidence, we uphold the portion of the trial court's orders finding that respondent-mother's failure to make progress on the case plan in this case demonstrated willfulness.

## IV.    Conclusion

¶ 31    The trial court did not err by terminating respondent-mother's parental rights. Contrary to respondent-mother's arguments, the trial court's findings involving the ample time respondent-mother had to make progress on her case plan, her failure to adequately address her substance abuse and mental health issues, and the willfulness of her actions were all supported by clear, cogent, and convincing evidence. When considered in conjunction with respondent-mother's admission that

the children were in DSS custody for more than twelve months, the findings support the trial court's conclusion that grounds for termination existed under N.C.G.S. § 7B-1111(a)(2). Since respondent-mother has not challenged the trial court's determination that termination was in the best interests of the five children, the trial court properly terminated her parental rights in Allie, Gregory, Teddy, Johnson, and Braxton. As a result, we affirm the orders of the trial court.

AFFIRMED.